# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| In re: Purfoods, Inc. Data Security Litigation | Case No.: 4:23-cv-00332-RGE-SBJ |
| This Filing Relates to:<br>All Cases | **<u>JURY TRIAL DEMANDED</u>** |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiffs Michael Douglas, Dorothy Goodon, Clyde Burry, Dorothy Alexander, Stella Keritsis, Johnnie Jones, Yolanda Betts, Steven D'Angelo, Ronald Emmert, Christine Ashe, Vernita Ford, Diane Young, and Logan Aldridge, individually and on behalf of all others similarly situated, for their Consolidated Class Action Complaint, bring this class action against Defendant PurFoods, LLC d/b/a Mom's Meals ("PurFoods" or "Defendant"), and allege, based on personal knowledge and the investigation of counsel as follows:

## I.     INTRODUCTION

1.     Between January 16, 2023 and February 22, 2023, an unauthorized third-party actor gained access to Defendant's inadequately and negligently protected computer systems. As a result, Plaintiffs and Class Members had their Private Information (defined below) exposed to cybercriminals (the "Data Breach").

2.     PurFoods, which operates under the name "Mom's Meals," is a meal-delivery company based in Ankeny, Iowa, that prepares and delivers refrigerated, ready-to-eat meals to customers all over the United States. Defendant markets its services for individuals with special health conditions, and it specializes in preparing meals that support various health conditions.[1]

---

[1] *See generally* PurFoods, https://www.purfoods.com/ (last accessed Oct. 2, 2023).

3.      As part of its food sale operations, PurFoods collects, maintains, and stores highly sensitive personal and medical information belonging to its customers and employees, including, but not limited to: Social Security numbers, dates of birth, full names, addresses, and employee ID numbers (collectively, "personally identifying information" or "PII"),[2] information regarding medical treatment, diagnosis, patient ID numbers, meal categories and cost information, health insurance information, and other protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (collectively, "private health information" or "PHI"), as well as financial account/payment card information ("financial account information") (collectively, "Private Information").

4.      In carrying out its business, Defendant obtains, collects, uses, and derives a benefit from Plaintiffs' and Class Members' Private Information. As such, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their Private Information from unauthorized access and intrusion.

5.      Although third parties infiltrated Defendant's computer systems in January 2023, it was not until February 22, 2023, that Defendant detected suspicious activity on its network. Defendant launched an investigation with the help of third-party specialists. This investigation, which concluded on July 10, 2023, determined that Private Information belonging to Defendant's customers and/or employees potentially had been exfiltrated, *i.e.*, stolen, by cybercriminals in a successful cyber-attack between January 16, 2023 and February 22, 2023. According to Defendant,

---

[2] PII generally includes information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. *See* 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

the Data Breach resulted in the encryption of certain files on Defendant's network and the unauthorized transfer of data from its network.

6.     In late August and early September of 2023, Defendant began notifying Plaintiffs and Class Members of the Data Breach through individual notice letters ("Notice(s) of the Data Breach" or "Notice Letter(s)"). *See, e.g.*, **Exhibit 1**.

7.     According to notice that Defendant provided to the Attorney General of Maine, the Private Information exposed in the Breach included Social Security numbers, driver's license/state identification numbers, financial account and/or payment card information, medical information, health information, and dates of birth.[3]

8.     Further, according to a notice that Defendant posted to its website, the Private Information compromised in the Data Breach includes Social Security numbers, and "date of birth, driver's license/state identification number, financial account information, payment card information, medical record number, Medicare and/or Medicaid identification, health information, treatment information, diagnosis code, meal category and/or cost, health insurance information, and patient ID number."[4]

9.     The Data Breach occurred because of Defendant's negligence and inexcusable failure to implement reasonable security measures to safeguard its information systems and databases from unauthorized access.

---

[3] Office the Maine Attorney General, *Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/c7ad1c53-6e20-41d8-8fb6-f1ccd0e3e0cc.shtml.

[4] *Notice of Data Event*, PurFoods, https://www.purfoods.com/notice-of-data-event/ (last accessed Nov. 20, 2023).

10.     Defendant failed to inform the public, including Plaintiffs and Class Members, that its data security practices and systems were deficient, inadequate, and negligently maintained. Had Plaintiffs and Class Members been made aware of this fact, they would have never provided their Private Information to Defendant or anyone in Defendant's position.

11.     After the Data Breach, Defendant failed to adequately handle and remedy the Data Breach. Defendant failed to timely detect and end the Data Breach until **37 days** after the initial breach. Defendant failed to conduct a timely investigation into the Data Breach, but rather took **138 days** from February 22, 2023 to July 10, 2023, to conclude its investigation. Defendant did not provide notice to Plaintiffs or the Class Members that their Private Information was accessed and stolen by cybercriminals until **184 days**—*over six months*—after PurFoods first discovered the Data Breach. Defendant's negligence is inexcusable.

12.     **Over 220 days** lapsed from the initial breach to the day Defendant finally notified Plaintiffs and Class Members that their Private Information had been stolen by cybercriminals. During that time, cybercriminals had unfettered access to peruse, steal, and exploit Plaintiffs' and Class Members' Private Information completely uninterrupted.

13.     Due to Defendant's negligence, cybercriminals obtained everything they needed to commit identity theft and wreak havoc on the personal lives of thousands of individuals. Defendant's meager attempt to ameliorate the effects of the Data Breach with one year of complimentary credit monitoring is woefully inadequate. Much of the Private Information that was stolen is immutable and a single year of credit monitoring offers little protection in the face of a life-long heightened risk of identity theft.

14.     On information and belief, the precise categories of Private Information compromised vary depending on whether impacted persons were Defendants' employees or

customers. However, because the categories of Private Information accessed and potentially exfiltrated by malevolent actors are highly sensitive regardless of the type of Private Information at issue, all Plaintiffs and Class Members now face a concrete and imminent risk of identity theft.

15.     For the rest of their lives, Plaintiffs and Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Plaintiffs and Class Members will have to spend time responding to the Data Breach and are at an immediate, imminent, and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiffs and Class Members have incurred and/or will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their Private Information, loss of privacy, and/or additional damages as described below.

16.     As a result of Defendant's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiffs and Class Members suffered or are substantially certain to suffer injuries as a result of Defendant's conduct including, but not limited to:

- Identity theft;

- Attempted identity theft;

- Invasion of privacy;

- Loss of the benefit of the bargain;

- Increase in spam calls, texts, and/or emails;

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

- Time needed to change usernames and passwords on their accounts;

- Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach; and

- Charges and fees associated with fraudulent charges on their accounts; and the continued and increased risk of compromise to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

17.     Defendant betrayed the trust of Plaintiffs and Class Members by failing to properly safeguard and protect their Private Information, thereby enabling cybercriminals to steal such valuable and sensitive information.

18.     Since the Data Breach, Defendant has not unequivocally assured victims of the Data Breach that it has retrieved the stolen information or confirmed that their Private Information is no longer in the hands of unauthorized individuals. As a result, Plaintiffs' and Class Members' Private Information remains in the hands of criminals due to Defendant's negligence and failure to reasonably protect the sensitive information.

19.     Plaintiffs bring this action individually and on behalf of the Class, to redress Defendant's unlawful, willful and wanton failure to protect the Personal Information of approximately 1,237,681 individuals[5] that was exposed in a major data breach of Defendant's network in violation of its legal obligations, seeking remedies including, but not limited to,

---

[5] Office the Maine Attorney General, *Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/c7ad1c53-6e20-41d8-8fb6-f1ccd0e3e0cc.shtml.

compensatory damages, reimbursement of out-of-pocket costs, injunctive relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

## II.     THE PARTIES

20.     Plaintiff Michael Douglas is, and at all times mentioned herein was, an individual citizen of Ohio.

21.     Plaintiff Dorothy Goodon is, and at all times mentioned herein was, an individual citizen of Iowa.

22.     Plaintiff Clyde Burry is, and at all times mentioned herein was, an individual citizen of Louisiana.

23.     Plaintiff Dorothy Alexander is, and at all times mentioned herein was, an individual citizen of Mississippi.

24.     Plaintiff Stella Keritsis is, and at all times mentioned herein was, an individual citizen of Florida.

25.     Plaintiff Johnnie Jones is, and at all times mentioned herein was, an individual citizen of Georgia.

26.     Plaintiff Yolanda Betts is, and at all relevant times mentioned herein was, an individual citizen of Texas.

27.     Plaintiff Steven D'Angelo is, and at all relevant times mentioned herein was, an individual citizen of Pennsylvania.

28.     Plaintiff Ronald Emmert is, and at all relevant times mentioned herein was, an individual citizen of Tennessee.

29.     Plaintiff Christine Ashe is, and at all relevant times mentioned herein was, an individual citizen of Pennsylvania.

30.     Plaintiff Vernita Ford is, and at all relevant times mentioned herein was, an individual citizen of Texas.

31.     Plaintiff Diane Young is, and at all relevant times mentioned herein was, an individual citizen of Pennsylvania.

32.     Plaintiff Logan Aldridge is, and at all relevant times mentioned herein was, an individual citizen of Kentucky.

33.     Defendant Purfoods is a limited liability company organized under the laws of Iowa with its principal place of business in Ankeny, Iowa.

34.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

35.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III.     JURISDICTION AND VENUE

36.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs; there are more than 100 members in the proposed class; and at least one Class Member, including Plaintiffs Douglas, Burry, Alexander, Keritsis, Jones, Betts, D'Angelo Emmer, Ashe, Ford, Young, and Aldridge are a citizen of a state different from Defendant to establish minimal diversity.

37.     The Southern District of Iowa has personal jurisdiction over Defendant because it is organized under the laws of, and is headquartered and conducts substantial business in Iowa, and collected and/or stored the Private Information of Plaintiffs and Class Members in Iowa.

38.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant operates in this District and a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District, including Defendant collecting and/or storing the Private Information of Plaintiffs and Class Members.

## IV.     FACTUAL ALLEGATIONS

*Background*

39.     PurFoods, doing business as "Mom's Meals," is a healthcare provider that sells and distributes directly to homes all over the United States fully prepared, prepackaged, refrigerated meals that cater towards or accommodate various common ailments and health conditions.[6]

40.     As part of its operations, Defendant collects, maintains, and stores the highly sensitive Private Information, such as PII and PHI, provided by its current and former customers and employees, including but not limited to: Social Security numbers, driver's license/state identification numbers, financial account and/or payment card information, medical information, health information, dates of birth, Medicare and/or Medicaid identification, treatment information, diagnosis code, meal category and/or cost, health insurance information, and patient ID number.

41.     Defendant required Plaintiffs and Class Members to provide their Private Information in order to obtain Defendant's meal-delivery services and/or in order to obtain employment with Defendant.

---

[6] *See generally* Purfoods, https://www.purfoods.com/ (last visited Oct. 5, 2023).

42.     Defendant acquired, collected, and stored the Private Information of Plaintiffs and Class Members unencrypted and in an internet-accessible environment.

43.     In collecting, storing, and maintaining Plaintiffs' and Class Members' Private Information, Defendant had a duty to adopt reasonable measures to protect the Private Information from involuntary disclosure to third parties.

44.     Defendant has a continuing legal duty to keep customers' and employees' Private Information safe and confidential.

45.     Defendant also had duties under HIPAA, the FTC Act, contract, industry standards, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

46.     Despite this, Defendant failed to implement and use reasonable security procedures and practices as appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

47.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

48.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

49.     Current and former customers and employees of Defendant, including Plaintiffs and Class Members, made their Private Information available to Defendant with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. And, in the event of any unauthorized access, that Defendant would provide them with prompt and accurate notice.

50.     Plaintiffs and Class Members entrusted their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

51.     Plaintiffs and Class Members relied on this sophisticated Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

52.     This expectation was objectively reasonable and based on an obligation imposed on PurFoods by statute, regulations, industrial custom, and standards of general due care.

53.     As evidenced by the Data Breach, Defendant failed to implement necessary data security safeguards to protect and keep confidential Plaintiffs' and Class Members' Private Information. As a result, Plaintiffs' and Class Members' Private Information was accessed and stolen by cybercriminals during the Data Breach.

***The Data Breach***

54.     Between January 16, 2023 and February 22, 2023, due to Defendant's failure to maintain an adequate security system, an unknown hacker gained access to Defendant's systems and acquired certain files and information, including Plaintiffs' and Class Members' Private Information.

55.     Defendant's inadequate security system failed to timely notify Defendant of the hack, as Defendant did not detect the suspicious behavior until February 22, 2023, over a month after cybercriminals gained access to Defendant's system. Before then, cyber criminals were allowed to roam free on Defendant's network, downloading and transferring Plaintiffs' and Class Members' Private Information and encrypting files on Defendant's network.

56.     Defendant negligently delayed in responding to the Data Breach and did not conclude its review of the attack until July 10, 2023, *nearly five months later*.

57.     When Defendant did finally conclude its investigation with the help of third-party specialists, it determined that cybercriminals had successfully breached and encrypted its systems between January 16, 2023 and February 22, 2023, accessing and potentially exfiltrating Plaintiffs' and Class Members' Private Information, including full names, Social Security numbers, driver's license/state identification numbers, financial account and/or payment card information, medical information, health insurance information, and dates of birth. Indeed, Defendant was not able to rule out that Plaintiffs' and Class Members' data was exfiltrated by the hacker, as Defendant's investigation "identified the presence of tools that could be used for data exfiltration" on Defendant's servers.[7]

58.     In late August and early September 2023, ***over six months*** after Defendant discovered the data breach and ***over seven months*** since the breach first occurred, Defendant sent Plaintiffs and Class Members individual Notices of the Data Breach.

59.     Defendant admitted in the Notice Letters that an unauthorized actor accessed sensitive information about Plaintiffs and Class Members. *See* Ex. 1.

---

[7] Ex. 1.

60.     Omitted from the Notice Letters were the dates of Defendant's investigation, any explanation as to why it took Defendant *more than six months* to notify Plaintiffs and Class Members of the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

61.     To date, Defendant has reported that at least 1,237,681 individual's Private Information was stolen as a result of the Data Breach.[8]

62.     The unencrypted Private Information belonging to Plaintiffs and Class Members is likely to end up for sale on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type, or fall into the hands of companies that will use the detailed Private Information for targeted marketing without Plaintiffs' and Class Members' approval. Unauthorized individuals can easily access Plaintiffs' and Class Members' Private Information.

63.     Defendant was negligent and did not use reasonable security procedures and practices, such as encrypting the information or deleting it when it is no longer needed, as appropriate given the nature of the sensitive, unencrypted information it was maintaining concerning Plaintiffs and Class Members, causing the exposure of their Private Information.

**The Data Breach was Foreseeable**

64.     Data thieves regularly target companies, like Defendant, due to the highly sensitive information that those companies collect and maintain. Defendant knew and understood that

---

[8] Office the Maine Attorney General, *Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/c7ad1c53-6e20-41d8-8fb6-f1ccd0e3e0cc.shtml.

unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

65.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information and other sensitive information, like Defendant, preceding the date of the breach.

66.     The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[9] In 2022, the largest growth in compromises occurred in the healthcare sector.[10]

67.     In the third quarter of the 2023 fiscal year alone, 7,333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[11]

68.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April

---

[9] *2018 End-of-Year Data Breach Report*, Identity Theft Resource Center, https://www.idtheftcenter.org/2018-data-breaches/ (last visited Sept. 6, 2023).

[10] *2022 End-of-Year Data Breach Report*, Identity Theft Resource Center, https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf. (last visited November 27, 2023)

[11] *See ITRC Q3 Data Breach Analysis*, Identity Theft Resource Center, https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.

2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

69. Because Defendant had a duty to protect Plaintiffs' and Class Members' Private Information, Defendant should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

70. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

71. Moreover, Defendant was on notice that companies in the healthcare industry are susceptible targets for data breaches.

72. Indeed, ransomware-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and the U.S. Secret Service have warned potential targets like Defendant so they are aware of, and prepared for, a potential cyberattack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[12]

73. Defendant was on notice that the FBI has been concerned about data security in the healthcare industry in the years preceding the Data Breach. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned healthcare companies that hackers were

---

[12] Ben Kochman, *FBI , Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection.

targeting them: "The FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PI)."[13]

74.     In October 2019, the FBI published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" warning that, among other things, "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[14]

75.     In April 2020, ZDNet reported, in an article titled *Ransomware mentioned in 1,000+ SEC filings over the past year*: "Ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[15]

76.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a *Ransomware Guide* advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

---

[13] Finkle, Jim, *FBI Warns Healthcare Firms that They are Targeted by Hackers*¸ Reuters (Aug. 20, 2014) https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[14] *FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations* (Oct. 2, 2019), https://www.ic3.gov/Media/Y2019/PSA191002.

[15] *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNet (Apr. 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000- sec-filings-over-the-past-year/.

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[16]

77.     Healthcare related breaches have continued to increase rapidly because electronic data is a valuable asset. Companies operating within the healthcare industry "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From Social Security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[17]

78.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting companies such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

79.     Considering the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted Private Information concerning Plaintiffs and Class Members in an Internet-accessible environment, had reason to be on guard for the potential exfiltration of the Private Information, and Defendant's type of business had cause to be particularly on guard against such an attack.

---

[16] *Ransomware Guide – September 2020*, U.S. CISA (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.
[17] *How to Safeguard Hospital Data from Email Spoofing Attacks*, Inside Digital Health (Apr. 4, 2019) https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

80.     Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack.

***The Data Breach was Preventable***

81.     Healthcare providers are frequent targets of ransomware attacks by cybercriminals, due to the sensitive patient data the entities collect and maintain.[18] In a ransomware attack, the attackers use software to encrypt data on a compromised network, rendering it unusable and demanding payment to restore control over the network.[19] Ransomware attacks are particularly harmful for patients and healthcare providers alike, as they cause operational disruptions that result in lengthier patient stays, delayed procedures or test results, increased complications from surgery, and even increased mortality rates.[20] In 2021, 44% of healthcare providers who experienced a ransomware attack saw their operations disrupted for up to a week and 25% experienced disrupted services for up to a month.[21]

82.     Companies should treat ransomware attacks as any other data breach incident because ransomware attacks do not simply hold networks hostage, instead "ransomware groups

---

[18] Danny Palmer, *Ransomware warning: Now attacks are stealing data as well as encrypting it*, ZDNet (July 14, 2020), https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it.

[19] *Ransomware FAQs*, United States Cybersecurity & Infrastructure Security Agency, https://www.cisa.gov/stopransomware/ransomware-faqs (last accessed Nov. 21, 2023).

[20] Kat Jercich, *Ponemon study finds link between ransomware, increased mortality rate*, Healthcare IT News (September 22, 2021), https://www.healthcareitnews.com/news/ponemon-study-finds-link-between-ransomware-increased-mortality-rate.

[21] *The State of Ransomware in Healthcare 2022*, SOPHOS (May 31, 2022), https://assets.sophos.com/X24WTUEQ/at/4wxp262kpf84t3bxf32wrctm/sophos-state-of-ransomware-healthcare-2022-wp.pdf.

sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[22] As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence . . . the initial assumption should be that data may have been exfiltrated."

83. An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained thereon.[23] In 2020, over half of ransomware attackers exfiltrated data from a network before encrypting it.[24] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[25] And even where companies pay for the return of data, attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[26]

84. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted sensitive data within its network to protect against their publication and misuse in the event of a cyberattack.

---

[22] *Ransomware: The Data Exfiltration and Double Extortion Trends*, United States Cyber Security & Infrastructure Security Agency, https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (last accessed November 21, 2023).

[23] *The chance of data being stolen in a ransomware attack is greater than one in ten*, Emsisoft Blog, https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/ (last accessed Nov. 21, 2023).

[24] *2020 Ransomware Marketplace Report*, Coveware (November 4, 2020), https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report.

[25] *Id.*

[26] *Id.*

85.     By obtaining, collecting, and storing Private Information concerning Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

86.     Defendant could have prevented this Data Breach by, among other things, properly encrypting Private Information or otherwise ensuring that such Private Information was protected while in transit or accessible.

87.     As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[27]

88.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[27] *See How to Protect Your Networks from RANSOMWARE*, United States Federal Bureau of Investigation, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed November 21, 2023).

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[28]

89.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks. . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (*e.g.*, contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the

---

[28] *Id.* at 3-4.

website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (*e.g.*, .com instead of .net). . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it. . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic. . . .[29]

90.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; Remove privilege credentials

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full comprise

---

[29] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited July 17, 2023).

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- Apply principle of least-privilege

**Monitor for adversarial activities**
- Hunt for brute force attempts
- Monitor for cleanup of Event logs
- Analyze logon events

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[30]

91.    Given that Defendant was storing the Private Information concerning current and former employees and patients, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

92.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of Private Information belonging to Plaintiffs and Class Members.

93.    Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and/or data fields containing Plaintiffs' and Class Members' Private Information. Alternatively, Defendant could have destroyed the data it no longer had a reasonable

---

[30] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

need to maintain, or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

94.     Defendant's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

95.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect Plaintiffs' and Class Members' Private Information from being compromised.

96.     The ramifications of Defendant's failure to keep secure Plaintiffs' and Class Members' Private Information are long lasting and severe. Once Private Information is stolen—particularly health insurance information—fraudulent use of that information and damage to victims may continue for years.

***Defendant is in Breach of its Duties and Obligations to Protect Private Information***

97.     Defendant has an obligation to protect the Private Information belonging to Plaintiffs and Class Members. First, this obligation was mandated by government regulations and state laws, including HIPAA and FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of Private Information, including PII and medical records. And third, Defendant imposed such an obligation on itself with its promises, through its privacy policies and elsewhere, regarding the safe handling of data.

98.     Plaintiffs and Class Members provided, and Defendant obtained, their Private Information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

99.     As evidenced by data breach, Defendant failed to adhere to its duties to protect and keep confidential Plaintiffs' and the Class Members' Private Information.

### *Defendant Failed to Adhere to HIPAA Guidelines*

100.    Upon information and belief, Defendant is covered by HIPAA (45 C.F.R. § 160.102). As such, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

101.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921; 45 C.F.R. § 106.103. HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

102.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

103.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information, including health information that is kept or transferred in electronic form.

104.    HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII and PHI, regularly review access to data bases containing protected information, and implement procedures

and systems to detect, contain, and correct any unauthorized access to protected information. See 45 CFR § 164.302, *et seq*.

105.    HIPAA, as applied through federal regulations, also requires private information to be stored in a manner that renders it, "unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology. . . ." 45 CFR § 164.402.

106.    HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

107.    "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

108.    HIPAA's Security Rule requires Defendant to do the following:

   a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d.    Ensure compliance by their workforce.

109.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

110.    Additionally, HIPAA requires Defendant to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health

information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

111.   HIPAA and HITECH also obligate Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

112.   HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

113.   HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

114.   HIPAA also requires the Office of Civil Rights ("OCR"), within HHS, to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[31] The list of resources

---

[31] *Security Rule Guidance Material*, U.S. Department of Health and Human Services, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Nov. 21, 2023).

includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, *Guidance on Risk Analysis*.[32]

115.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414, further requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***." (Emphasis added).

116.    Upon information and belief, Defendant failed to implement and/or maintain procedures, systems, and safeguards to protect the PII and PHI belonging to Plaintiffs and the Class from unauthorized access and disclosure.

117.    Upon information and belief, Defendant's security failures include, but are not limited to:

a.    Failing to maintain an adequate data security system to prevent data loss;

b.    Failing to mitigate the risks of a data breach and loss of data;

c.    Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits in violation of 45 CFR § 164.306(a)(1);

d.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR § 164.312(a)(1);

e.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR § 164.308(a)(1);

f.    Failing to identify and respond to suspected or known security incidents;

---

[32] *Guidance on Risk Analysis*, U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index. html (last visited Oct. 5, 2023).

g.      Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR § 164.308(a)(6)(ii);

h.      Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR § 164.306(a)(2);

i.      Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR § 164.306(a)(3);

j.      Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR § 164.306(a)(94); and

k.      Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR §§ 164.502, *et seq.*

118.    Upon information and belief, Defendant also failed to store the information it collected in a manner that rendered it, "unusable, unreadable, or indecipherable to unauthorized persons," in violation of 45 CFR § 164.402.

119.    Defendant also violated the HIPAA Breach Notification Rule since it did not inform Plaintiffs and the Class Members about the breach until 184 days after it first discovered the breach.

120.    Defendant's negligence and failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PHI constitutes an unfair act or practice prohibited by HIPAA.

121.    Because Defendant has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure Defendant's approach to information security is adequate and appropriate going forward. Defendant still maintains the PHI and other highly sensitive PII of its current and former customers and employees, including Plaintiffs and Class Members. Without the supervision of the Court

through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

***Defendant Failed to Adhere to the FTC Guidelines.***

122.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

123.    The FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

124.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[33] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[34]

---

[33] 17 C.F.R. § 248.201 (2013).
[34] *Id.*

125.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should:

      a.      Protect the sensitive consumer information that they keep;

      b.      Properly dispose of PII that is no longer needed;

      c.      Encrypt information stored on computer networks;

      d.      Understand their network's vulnerabilities; and

      e.      Implement policies to correct security problems.

126.    The Guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

127.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

128.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

129.     Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. See 16 CFR 318.1, *et seq*.

130.     As evidenced by the Data Breach, Defendant failed to implement properly basic data security practices. Defendant's negligence and failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

131.     Defendant was fully aware of its obligation to protect the Private Information of its current and former customers and employees, including Plaintiffs and Class Members, as, on information and belief, Defendant is a sophisticated and technologically savvy entity that relies extensively on technology systems and networks to maintain its practice, including storing its customers' and employees' PII, PHI, and financial information in order to operate its business.

132.     Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiffs and Class Members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiffs' and Class Members' Private Information.

### Defendant Failed to Adhere to Industry Standards

133.     As noted, healthcare businesses are routinely identified as particularly vulnerable to cyberattacks because of the value of the Private Information that they collect and maintain.

134.     The U.S. Department of Health and Human Services' ("HHS") Office for Civil

Rights has stated:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[35]

135.     HHS highlights several basic cybersecurity safeguards that can be implemented to

improve cyber resilience that require a relatively small financial investment yet can have a major

impact on an organization's cybersecurity posture including: (i) the proper encryption of Private

Information; (ii) educating and training healthcare employees on how to protect Private

Information and (iii) correcting the configuration of software and network devices.

136.     Private cybersecurity firms have also identified the healthcare sector as being

particularly vulnerable to cyber-attacks, both because of the value of the Private Information which

they maintain and because as an industry they have been slow to adapt and to respond to

cybersecurity threats.[36] They too have promulgated similar best practices for bolstering

cybersecurity and protecting against the unauthorized access to and disclosure of Private

Information.

137.     Some industry best practices that should be implemented by businesses dealing

with sensitive PHI like Defendant include but are not limited to: educating all employees, strong

password requirements, multilayer security including firewalls, anti-virus and anti-malware

---

[35] Cybersecurity Best Practices for Healthcare Organizations, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

[36] *See, e.g.*, 10 Best Practices For Healthcare Security, INFOSEC, https://resources.infosecinstitute.com/topics/healthcare-information-security/#gref.

software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

138.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

139.    Defendant should have also followed the minimum standards of any one of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

140.    Despite the abundance and availability of information regarding cybersecurity best practices, Defendant chose to ignore them. These best practices were known, or should have been known by Defendant, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

141.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

***Defendant Failed to Adhere to Its Own Stated Policies and Promises***

142.     Defendant made promises and representations, including to Plaintiffs and Class Members, that the Private Information collected from them as a condition of employment and/or submitting an application for food delivery services would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

143.     Defendant's own published privacy policy promises that it uses SSL encryption and employs industry standard data security practices to maintain the privacy and security of PHI.[37] Defendant's policy also promises to notify persons promptly if a breach occurs that may have compromised the privacy and security of their information.[38]

144.     Indeed, Section III of Defendant's Privacy Policy states:

> The security of your Personal Information is important to us. When you enter sensitive information (such as credit card number) on our registration or order forms, we encrypt that information using secure socket layer technology (SSL). To learn more about SSL, follow this link www.verisign.com.
>
> We follow generally accepted industry standards to protect the Personal Information submitted to us, both during transmission and once we receive it.[39]

145.     Clearly, Defendant failed to live up to its own stated policies and promises with regards to data privacy and data security, as cybercriminals were able to infiltrate its systems and steal Plaintiffs' and Class Members' Private Information. Had the Private Information been

---

[37] Privacy Policy (Personal Information), PurFoods, https://www.purfoods.com/privacy-policy/#:~:text=PurFoods%20does%20not%20store%20any,cookies%20to%20your%20Personal%20Information (last accessed Oct. 2, 2023).

[38] *Id.*

[39] *Id.*

encrypted, the data thieves would have acquired unintelligible information. Further, Defendant delayed almost seven months between discovering the breach and issuing notice. This delay was far beyond what is reasonable acceptable or statutorily mandated.

***Defendant's Response to the Data Breach was Inadequate***

146.    Defendant was negligent and failed to inform Plaintiffs and Class Members of the Data Breach in a timely manner, so that Plaintiffs and Class Members could take steps to protect themselves from identity theft.

147.    Defendant admitted that it learned of the Data Breach as early as February 22, 2023, and confirmed the extent of the Data Breach on July 10, 2023. Yet, Defendant did not start notifying affected individuals until almost two months later, in late August and early September 2023.

148.    During these intervals, cybercriminals have had the opportunity to exploit Plaintiffs' and Class Members' Private Information while Defendant was secretly investigating the Data Breach.

149.    In response to the Data Breach, Defendant offered to provide certain individuals whose Private Information was exposed in the Data Breach with just a single year of credit monitoring through Kroll. However, one year is much shorter than what is necessary to protect against the lifelong risk of harm imposed on Plaintiffs and Class Members by Defendant's failures.

150.    Moreover, the credit monitoring offered by Defendant is fundamentally inadequate to protect them from the injuries resulting from the unauthorized access and potential exfiltration of their sensitive Private Information.

***Value of Private Information***

36

151.    Private Information has a high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[40] For example, Private Information can be sold at a price ranging from $40 to $200.[41] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[42] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[43]

152.    Social Security numbers are among the worst kind of Private Information to have stolen, as they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[44]

---

[40] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[41] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[42] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Nov. 21, 2023).

[43] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed July 17, 2023).

[44] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

153.    Further, it is exceedingly difficult to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

154.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[45]

155.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

156.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider,

---

[45] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.rge.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

157.    According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[46]

158.    Based on the foregoing, much of the Private Information compromised in the Data Breach is significantly more valuable than, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, names, dates of birth, and health information.

159.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[47]

160.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[48]

---

[46] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

[47] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

[48] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

161.    Similarly, health insurance information can be used to steal someone's medical identity.[49] Once someone's medical identity has been stolen, the information can be used to fraudulently obtain medical care or submit fraudulent claims for payment to health insurers without your authorization.[50] This type of identity theft can lead to unauthorized charges on a patient's account, incorrect reporting of a patient's medical record, and a diminished level of medical services.

162.    Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[51]

163.    Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[52]

---

[49] U.S. Dep't of Veterans Affairs Office of Inspector General & Federal Bureau of Investigation, FRAUD ALERT Medical Identity Theft, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.va.gov/oig/fraud/Medical_Identity_Theft.pdf (last visited on Sept. 5, 2023).

[50] *Id.*

[51] Mills, Elinor, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited Sept. 6, 2023).

[52] *Id.*

164.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

165.     One such example of criminals using Private Information for profit is the development of "Fullz" packages.

166.     Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

167.     The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

168.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

169.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the

foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

**Plaintiffs' Individual Experiences**

### *Plaintiff Michael Douglas' Experience*

170.    Plaintiff Michael Douglas is a former employee of Defendant.

171.    As a condition of his employment, Plaintiff Douglas was required to provide his Private Information to Defendant.

172.    On August 24, 2024, Plaintiff Douglas received a Notice Letter from Defendant. This letter informed him that his name, Social Security number, date of birth, Employee ID number, and health insurance information were exposed in a Data Breach.

173.    Following the Data Breach, Plaintiff Douglas experienced a dramatic increase in the number of spam phone calls and emails.

174.    As a result of the Data Breach and the resulting suspicious activity, Plaintiff Douglas has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. He has also spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

175.    Because of the exposure of his Private Information in the Data Breach, Plaintiff Douglas subscribed to a credit monitoring service through myFICO, for which he pays a subscription fee of $29.99 a month.

176.   As a result of the Data Breach, Plaintiff Douglas has suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his private information for purposes of identity theft and fraud. Plaintiff Douglas is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

177.   Plaintiff Douglas suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) out of pocket expenses incurred to mitigate the effects of the Data Breach, safeguard his Private Information, and protect himself against the imminent and concrete risk of identity theft.

178.   As a result of the Data Breach, Plaintiff Douglas anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Dorothy Goodon's Experience

179.   Plaintiff Dorothy Goodon is a former employee and customer of Defendant. She was employed by Defendant from March 2021 to December 2022, and she ordered meals from Defendant for her mother.

180.   As a condition of both her employment by Defendant, and to be a customer of Defendant, Plaintiff Goodon was required to provide her Private Information to Defendant.

181.   On August 24, 2023, Plaintiff Goodon received a Notice Letter from Defendant. This letter informed her that her name, Social Security number, date of birth, Employee ID number, and financial account information were exposed in a data breach.

182.   After the Data Breach, Plaintiff Goodon's bank account was compromised multiple times, and she has experienced a significant increase in the number of spam calls and emails.

183.   As a result of the Data Breach and the subsequent suspicious activities, Plaintiff Goodon has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. She has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

184.   As a result of the Data Breach, Plaintiff Goodon has suffered anxiety due to the public dissemination of her personal information, which she reasonably believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her private information for purposes of identity theft and fraud. Plaintiff Goodon is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

185.   Plaintiff Goodon suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

186.     As a result of the Data Breach, Plaintiff Goodon anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Clyde Burry's Experience

187.     Plaintiff Burry is a former client of Defendant.

188.     As a condition of receiving Defendant's services, Plaintiff Burry was required to provide his Private Information to Defendant. Plaintiff Burry provided Defendant with highly sensitive health and insurance information.

189.     Plaintiff Burry's information was among the data accessed by an unauthorized third-party in the Data Breach.

190.     On August 25, 2023, Plaintiff Burry received a Notice Letter from Defendant. This letter informed him that his name, date of birth, diagnosis code, health insurance information, meal category and/or cost, and treatment information were exposed in a data breach.

191.     Plaintiff Burry was unaware of the Data Breach until receiving that letter.

192.     As a result, Plaintiff Burry was injured in the form of lost time dealing with the consequences of the Data Breach, which included and continues to include: time spent verifying the legitimacy and impact of the Data Breach; time spent exploring credit monitoring and identity theft insurance options; time spent self- monitoring his accounts with heightened scrutiny and time spent seeking legal counsel regarding their options for remedying and/or mitigating the effects of the Data Breach.

193.     Plaintiff Burry was also injured by the material risk to future harm he suffers based on Defendant's breach; this risk is imminent and substantial because Plaintiff Burry's Private

Information has been exposed in the breach, the data involved, including healthcare information, is highly sensitive and presents a high risk of identity theft or fraud.

194.     Plaintiff Burry suffered actual injury in the form of damages to and diminution in the value of his Private Information—a condition of intangible property that they entrusted to Defendant, which was compromised in and as a result of the Data Breach.

195.     Plaintiff Burry, as a result of the Data Breach, has increased anxiety for his loss of privacy and anxiety over the impact of cybercriminals accessing, using, and selling his Private Information.

196.     Plaintiff Burry has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

197.     Plaintiff Burry has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

198.     Plaintiff Burry suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

199.     As a result of the Data Breach, Plaintiff Burry anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data

Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Dorothy Alexander's Experience*

200.    Plaintiff Dorothy Alexander is a former customer that obtained food delivery services from Defendant in or about 2023.

201.    In order to obtain food delivery services at Defendant, Plaintiff Alexander was required to provide her Private Information to Defendant, including her name and health insurance information.

202.    At the time of the Data Breach—approximately January 16, 2023 through February 22, 2023—Defendant retained Plaintiff Alexander's Private Information in its system, despite her no longer being a customer at Defendant.

203.    Plaintiff Alexander is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

204.    Plaintiff Dorothy Alexander received the Notice Letter, by email, directly from Defendant, dated August 24, 2023. According to the Notice Letter, Plaintiff Alexander's Private Information was improperly accessed and obtained by unauthorized third parties, including her name, health insurance information, and meal category and/or cost.

205.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Alexander made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter as

well as monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Alexander has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

206.    Plaintiff Alexander suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) lost time spent on activities remedying harms resulting from the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) diminution of value of her Private Information; and (vi) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect her Private Information.

207.    Plaintiff Alexander further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

208.    The Data Breach has caused Plaintiff Alexander to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

209.    As a result of the Data Breach, Plaintiff Alexander anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach.

210.    As a result of the Data Breach, Plaintiff Alexander is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

211.    Plaintiff Dorothy Alexander has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Stella Keritsis' Experience

212.    Plaintiff Kertisis entrusted her Private Information to Simply Healthcare. Simply Healthcare then entrusted Plaintiff Kertisis' Private Information to Defendant.

213.    Plaintiff Kertisis received Defendant's Notice of Data Breach dated August 24, 2023. The Notice stated that Plaintiff Kertisis' Private Information, including her name, date of birth, and health insurance information, was impacted by the Data Breach.

214.    As a result of the Data Breach, Plaintiff Kertisis' sensitive information may have been accessed and/or acquired by an unauthorized actor.

215.    The confidentiality of Plaintiff Kertisis' sensitive information has been irreparably harmed. For the rest of her life, Plaintiff Kertisis will have to worry about when and how her sensitive information may be shared or used to her detriment.

216.    As a result of the Data Breach, Plaintiff Kertisis spent time dealing with the consequences of the Data Breach, which includes times spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

217.    Additionally, Plaintiff Kertisis is very careful about not sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

218.    Plaintiff Kertisis stores any documents containing her sensitive Private Information in safe and secure locations or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

219.    Plaintiff Kertisis suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences fear and anxiety and increased concern for the loss of her privacy.

220.    Plaintiff Kertisis has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information, especially her health insurance information, being placed in the hands of unauthorized third parties and possibly criminals.

221.    Plaintiff Kertisis finds it very troubling that a duration of approximately six (6) months passed before Defendant finally contacted Plaintiff Kertisis. As a result of this negligent and unnecessary delay, Plaintiff Kertisis was not able to take necessary, timely steps to protect herself from fraud and identity theft.

222.    Plaintiff Kertisis has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

223.    Plaintiff Kertisis suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

224.    As a result of the Data Breach, Plaintiff Kertisis anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

### *Plaintiff Johnnie Jones' Experience*

225.    Plaintiff Jones was a customer of Defendant. When Plaintiff Jones became a customer of PurFoods, she was required to provide substantial amounts of her Private Information.

226.    On or about August 24, 2023, Plaintiff Jones received a Notice Letter from Defendant. This letter informed her that her name, health insurance information, and meal category and/or cost were exposed in a data breach.

227.    The Notice Letter offered Plaintiff Jones only one year of credit monitoring services, which is not sufficient given that Plaintiff Jones will now experience a lifetime of increased risk of identity theft, including but not limited to, potential medical fraud.

228.    Plaintiff Jones suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

229.    Plaintiff Jones would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' personal and health information from theft, and that those systems were subject to a data breach.

230.    Plaintiff Jones suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

231.    Plaintiff Jones suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information—a form of intangible property that Plaintiff Jones entrusted to Defendant for the purpose of receiving meal delivery services from Defendant and which was compromised in, and as a result of, the Data Breach.

232.    Plaintiff Jones suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

233.    Plaintiff Jones has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, are protected and safeguarded from future breaches.

234.    As a result of the Data Breach, Plaintiff Jones made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Jones has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

235.    As a result of the Data Breach, Plaintiff Jones has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Jones is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

236.    Plaintiff Jones also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the

value of her Private Information, a form of property that Defendant obtained from Plaintiff Jones; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

237.    As a result of the Data Breach, Plaintiff Jones anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

### *Plaintiff Yolanda Betts' Experience*

238.    Plaintiff Yolanda Betts has been a customer of PurFoods for almost two years.

239.    On or about August 25, 2023, Plaintiff Betts received a Notice Letter informing her that her name, billing information, diagnosis code, health insurance information, meal category and/or cost, patient ID number, and treatment information was compromised in the Data Breach.

240.    Since receiving the Notice, Plaintiff Betts has been required to spend valuable time monitoring her various accounts and changing her account passwords in an effort to detect and to prevent any misuses of her Private Information—time which she would not have had to expend but for the Data Breach.

241.    As a result of the Data Breach, Plaintiff Betts will continue to be at heightened and certainly impending risk for fraud and identity theft and her attendant damages for years to come.

242.    As a requisite to receiving goods and services, Plaintiff Betts provided her Private Information to PurFoods and trusted that the information would be safeguarded according to state and federal law.

243.    Plaintiff Betts is very careful about sharing her sensitive Private Information. Plaintiff Betts has never knowingly transmitted unencrypted sensitive Private Information. Plaintiff Betts stores any documents containing her sensitive Private Information in a safe and

secure location or destroys the documents. Moreover, Plaintiff Betts diligently chooses unique usernames and passwords for her various online accounts.

244.    Had Plaintiff Betts known that PurFoods failed to follow basic industry security standards and failed to implement systems to protect her Private Information, she would not have provided that information to Defendant.

245.    As a result of the Data Breach and the lack of detailed notification, Plaintiff Betts is extremely anxious about the safety of her information.

246.    Plaintiff Betts further suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that she entrusted to Defendant, which was compromised in and as a result of the Data Breach.

247.    She also lost her benefit of the bargain by paying for meal delivery services that failed to provide the data security that was promised.

248.    Plaintiff Betts suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

249.    Plaintiff Betts has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

250.    Plaintiff Betts has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

251.    As a result of the Data Breach, Plaintiff Betts heeded PurFoods' warning and spent time dealing with the consequences of the Data Breach, which includes time spent verifying the

legitimacy of the Notice of Data Breach and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred.

252.    This time has been lost forever and cannot be recaptured. Moreover, this time was spent at PurFoods' direction by way of the Data Breach notice where it advised Plaintiff Betts to mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

253.    Plaintiff Betts suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

254.    As a result of the Data Breach, Plaintiff Betts anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

### *Plaintiff Steven D'Angelo's Experience*

255.    Plaintiff D'Angelo is, and has been since prior to the breach, a patient of one of Defendant's customers.

256.    On or around September 6, 2023, Plaintiff D'Angelo received a Notice of Data Breach from Defendant. This letter informed him that his name, billing information, date of birth, diagnosis code, health insurance information, meal category and/or cost, and treatment information were exposed in the Data Breach.

257.     As a result of the Data Breach, Plaintiff D'Angelo spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Data Breach. This time has been lost forever and cannot be recaptured.

258.     Additionally, Plaintiff D'Angelo is very careful about sharing his Private Information. He has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff D'Angelo stores any documents containing his Private Information in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for his few online accounts.

259.     Plaintiff D'Angelo suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff D'Angelo entrusted to Defendant for the purpose of obtaining services from Defendant's customers, which was compromised in and as a result of the Data Breach.

260.     Plaintiff D'Angelo suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

261.     Plaintiff D'Angelo has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

262.     Plaintiff D'Angelo suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

263.     As a result of the Data Breach, Plaintiff D'Angelo anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Ronald Emmert*

264.     Plaintiff Emmert was a customer of Defendant. As a condition of receiving Defendant's services, Plaintiff Emmert was required to provide Defendant with significant amount of his Private Information. As a result, Plaintiff Emmert information was among the data accessed by an unauthorized third party in the Data Breach.

265.     On August 30, 2023, Plaintiff Emmert received a Notice Letter from Defendant. This letter informed him that his name, meal category and/or cost were exposed in a data breach..

266.     As a result, Plaintiff Emmert spent time dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring Plaintiff Emmert's accounts and seeking legal counsel regarding Plaintiff Emmert's options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured.

267.     As a result of the data breach, Plaintiff Emmert has suffered actual injury in the form of unauthorized charges on his credit cards and in significant increase in suspicious spam calls, emails and messages.

268.     Plaintiff Emmert suffered actual injury in the form of damages to and diminution in the value of Plaintiff Emmert's Private Information—a form of intangible property that Plaintiff Emmert entrusted to Defendant, which was compromised in and as a result of the Data Breach.

269.    Plaintiff Emmert suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Emmert's Private Information.

270.    Plaintiff Emmert suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from Plaintiff Emmert's Private Information, in combination with Plaintiff Emmert's name, being placed in the hands of unauthorized third parties/criminals.

271.    Plaintiff Emmert has a continuing interest in ensuring that Plaintiff Emmert's Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

272.    Plaintiff Emmert suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of him privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

273.    As a result of the Data Breach, Plaintiff Emmert anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Christina Ashe's Experience

274.    Plaintiff Ashe is a former customer of Defendant, receiving home food delivery services or supplies from Defendant from 2017 through 2020.

275.     Plaintiff Ashe received a Notice of Data Breach, dated August 28, 2023, stating that her Private Information–including her name, billing information, diagnosis code, health insurance information, meal category and/or cost, and treatment information—may have been exposed in the Data Breach.

276.     As a result of the Data Breach, Plaintiff Ashe's sensitive information may have been accessed and/or acquired by an unauthorized actor.

277.     The confidentiality of Plaintiff Ashe's sensitive information has been irreparably harmed. For the rest of her life, Plaintiff Ashe will have to worry about when and how her sensitive information may be shared or used to her detriment.

278.     As a result of the Data Breach, Plaintiff Ashe spent time dealing with the consequences of the Data Breach, which includes times spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

279.     Additionally, Plaintiff Ashe is very careful about not sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Ashe stores any documents containing her sensitive Private Information in safe and secure locations or destroys the documents.

280.     Plaintiff Ashe suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences fear and anxiety and increased concern for the loss of her privacy.

281.     Plaintiff Ashe has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private

Information, especially her health insurance information, being placed in the hands of unauthorized third parties and possibly criminals.

282.    Plaintiff Ashe has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

283.    Plaintiff Ashe suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

284.    As a result of the Data Breach, Plaintiff Ashe anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

### Plaintiff Vernita Ford's Experience

285.    Plaintiff Ford is a former customer of Defendant, receiving home food delivery services or supplies from Defendant from approximately 2019 to 2021.

286.    Plaintiff Ford received a Notice of Data Breach, dated August 30, 2023, stating that her Private Information—including her name, Medicare and/or Medicaid identification, billing information, date of birth, diagnosis code, health insurance information, meal category, and/or cost, and treatment information—may have been exposed in the Data Breach.

287.    As a result of the Data Breach, Plaintiff Ford's sensitive information may have been accessed and/or acquired by an unauthorized actor.

288.    The confidentiality of Plaintiff Ford's sensitive information has been irreparably harmed. For the rest of her life, Plaintiff Ford will have to worry about when and how her sensitive information may be shared or used to her detriment.

289.    As a result of the Data Breach, Plaintiff Ford spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

290.    Additionally, Plaintiff Ford is very careful about not sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Ford stores any documents containing her sensitive Private Information in safe and secure locations or destroys the documents.

291.    Plaintiff Ford suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences fear and anxiety and increased concern for the loss of her privacy.

292.    Plaintiff Ford has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information, especially her health insurance information, being placed in the hands of unauthorized third parties and possibly criminals.

293.    Plaintiff Ford has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

294.    Plaintiff Ford suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and

diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

295.    As a result of the Data Breach, Plaintiff Ford anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

### Plaintiff Diane Young

296.    Plaintiff Young is a former customer of Defendant, receiving home food delivery services or supplies from Defendant during the COVID-19 pandemic.

297.    Plaintiff Young received a Notice of Data Breach, dated September 6, 2023, stating that her Private Information—including her name, date of birth, diagnosis code, health insurance information, meal category and/or cost, and treatment information—may have been exposed in the Data Breach.

298.    As a result of the Data Breach, Plaintiff Young's sensitive information may have been accessed and/or acquired by an unauthorized actor.

299.    The confidentiality of Plaintiff Young's sensitive information has been irreparably harmed. For the rest of her life, Plaintiff Young will have to worry about when and how her sensitive information may be shared or used to her detriment.

300.    As a result of the Data Breach, Plaintiff Young spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

301.    Additionally, Plaintiff Young is very careful about not sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Young stores any documents containing her sensitive Private Information in safe and secure locations or destroys the documents.

302.    Plaintiff Young suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences fear and anxiety and increased concern for the loss of her privacy.

303.    Plaintiff Young has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information, especially her health insurance information, being placed in the hands of unauthorized third parties and possibly criminals.

304.    Plaintiff Young has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

305.    Plaintiff Young suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

306.    As a result of the Data Breach, Plaintiff Young anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Logan Aldridge's Experience***

307.    Plaintiff Logan Aldridge has been a customer of PurFoods since approximately July 2022.

308.    On or about August 25, 2023, Plaintiff Aldridge received the Notice informing him that his name, billing information, diagnosis code, health insurance information, meal category and/or cost, patient ID number, and treatment information was compromised in the Data Breach.

309.    Since receiving the Notice, Plaintiff Aldridge has been required to spend valuable time monitoring his various accounts and changing his account passwords in an effort to detect and to prevent any misuses of his Private Information—time which he would not have had to expend but for the Data Breach.

310.    As a result of the Data Breach, Plaintiff Aldridge will continue to be at heightened and certainly impending risk for fraud and identity theft and their attendant damages for years to come.

311.    As a requisite to receiving goods and services, Plaintiff Aldridge provided his Private Information to PurFoods and trusted that the information would be safeguarded according to state and federal law.

312.    Plaintiff Aldridge is very careful about sharing his sensitive Private Information. Plaintiff Aldridge has never knowingly transmitted unencrypted sensitive Private Information. Plaintiff Aldridge stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Aldridge diligently chooses unique usernames and passwords for his various online accounts.

313.     Had Plaintiff Aldridge known that PurFoods failed to follow basic industry security standards and failed to implement systems to protect his Private Information, he would not have provided that information to Defendant.

314.     As a result of the Data Breach and the lack of detailed notification, Plaintiff Aldridge is extremely anxious about the safety of his information.

315.     Plaintiff Aldridge further suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that he entrusted to Defendant, which was compromised in and as a result of the Data Breach.

316.     He also lost his benefit of the bargain by paying for meal delivery services that failed to provide the data security that was promised.

317.     Plaintiff Aldridge suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

318.     Plaintiff Aldridge has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

319.     Plaintiff Aldridge has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

320.     As a result of the Data Breach, Plaintiff Aldridge heeded PurFoods' warning and spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.

321. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at PurFoods' direction by way of the Data Breach notice where it advised Plaintiff Aldridge to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

322. Plaintiff Aldridge suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of him privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

323. As a result of the Data Breach, Plaintiff Aldridge anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

***Plaintiffs and the Class Face Significant Risk of Continued Identity Theft***

324. Plaintiffs and Class Members have suffered injury from the misuse of their Private Information that can be directly traced to Defendant.

325. Defendant negligently failed to protect Plaintiffs' and Class Members' Private Information from criminals. Specifically, Defendant opened up, disclosed, and exposed the Private Information of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity theft and fraud), and unauthorized use of health insurance information (*i.e.*, health insurance fraud or medical identity fraud), all using the stolen Private Information.

326.    As a result of Defendant's negligence and failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.    The loss of the opportunity to control how their Private Information is used;

    b.    The diminution in value of their Private Information;

    c.    The compromise and continuing publication of their Private Information;

    d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud and/or health insurance theft or fraud;

    e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spend researching how to prevent, detect, contest, and recover form identity theft and fraud;

    f.    Delay in receipt of tax refund monies;

    g.    Unauthorized use of stolen Private Information; and

    h.    The continued risk to their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the Private Information in their possession.

327.    The fraudulent activity resulting from the Data Breach may not come to light for years.

328.    There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result,

studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[53]

329.     Defendant's negligence and failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

330.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. They are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

331.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in Defendant's database, amounting to millions of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

332.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, including healthcare information, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

333.     To date, Defendant has offered Plaintiffs and some Class Members only twelve (12) months of credit monitoring services. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the Private Information at issue here.

---

[53] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

334.    The injuries to Plaintiffs and Class Members are directly and proximately caused by Defendant's negligence and failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

## V.    CLASS ACTION ALLEGATIONS

335.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

336.    The Nationwide Class that Plaintiffs seek to represent is defined as:

> **All individuals whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Nationwide Class").**

337.    Plaintiff Michael Douglas proposes the following Ohio Subclass, defined as:

> **All residents of Ohio whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Ohio Subclass").**

338.    Plaintiff Dorothy Goodon proposes the following Iowa Subclass, defined as:

> **All residents of Iowa whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Iowa Subclass").**

339.    Plaintiff Clyde Burry proposes the following Louisiana Subclass, defined as:

> **All residents of Louisiana whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Louisiana Subclass").**

340.    Plaintiff Dorothy Alexander proposes the following Mississippi Subclass, defined

as:

> **All residents of Mississippi whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Mississippi Subclass").**

341.    Plaintiff Stella Keritsis proposes the following Florida Subclass, defined as:

> **All residents of Florida whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Florida Subclass").**

342.    Plaintiff Johnnie Jones proposes the following Georgia Subclass, defined as:

> **All residents of Georgia whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Georgia Subclass").**

343.    Plaintiffs Yolanda Betts and Vernita Ford propose the following Texas Subclass,

defined as:

> **All residents of Texas whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Texas Subclass").**

344.    Plaintiff Logan Aldridge proposes the following Kentucky Subclass, defined as:

> **All residents of Kentucky whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Kentucky Subclass").**

345.    Plaintiffs Steven D'Angelo, Christina Ashe, and Diane Young propose the

following Pennsylvania Subclass, defined as:

**All residents of Pennsylvania whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Pennsylvania Subclass").**

346.   Plaintiff Ronald Emmert proposes the following Tennessee Subclass, defined as:

**All residents of Tennessee whose Private Information may have been accessed and/or acquired in the Data Breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and Class Members on or around August and September 2023 (the "Tennessee Subclass").**

347.   Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class and Statewide Classes (collective "Classes") before the Court determines whether certification is appropriate.

348.   Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

349.   **Numerosity (Fed R. Civ. P. 23(a)(1)):** The Classes are so numerous that joinder of all members is impracticable. Defendant reported to the Maine Attorney General that 1,237,681 individuals were impacted by the Data Breach.

350.   **Commonality (Fed. R. Civ. P. 23(a)(2) & (b)(3)):** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

71

A.     Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

B.     Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

C.     Whether Defendant had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

D.     Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

E.     When Defendant actually learned of the Data Breach;

F.     Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

G.     Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

H.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

I.     Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

J.     Whether Defendant engaged in unfair, unlawful, or deceptive practice by failing to safeguard the Private Information of Plaintiffs and Class Members;

K.     Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

L.     Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

M.     Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

351.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

352.   **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

353.   **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Classes and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

354.   **Superiority and Manageability (Fed. R. Civ. P. 23(b)(3)):** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations,

like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

355.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

356.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

357.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

358.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

359.    Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## VI.    CAUSES OF ACTION

### COUNT I – NEGLIGENCE
**(On Behalf of Plaintiffs and the Nationwide Class, or in the alternative on behalf of the State Subclasses)**

360.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

361.    Defendant solicited, gathered, and stored Plaintiffs' and Class Members' Private Information as part of the operation of its business.

362.    Upon accepting and storing Plaintiffs' and Class Members' Private Information, Defendant undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

363.    Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

364.    Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiffs and Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

365.    Defendant was well aware of the fact that cyber criminals routinely target large corporations through cyberattacks in an attempt to steal sensitive Private Information.

366.    Defendant owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data.

367.    Defendant's duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

368.    Defendant had duties to protect and safeguard Plaintiffs' and Class Members' Private Information from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiffs and the Class include:

a.      To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible access, viewing, release, disclosure, and publication;

b.      To protect Plaintiffs' and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems;

c.      To implement processes to quickly detect a data breach, security incident, or intrusion involving their networks and servers; and

d.      To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

369.     Defendant was the only one who could ensure that its systems and protocols were sufficient to protect the Private Information that Plaintiffs and Class Members had entrusted to it.

370.    Defendant breached its duties of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

      a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Private Information in its possession;

      b.    Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

      c.    Failing to adequately train its employees to not store Private Information longer than absolutely necessary;

      d.    Failing to consistently enforce security policies aimed at protecting Plaintiffs' and Class Members' Private Information; and

      e.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions.

371.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

372.    As a proximate and foreseeable result of Defendant's negligent and/or grossly negligent conduct, Plaintiffs and Class Members have suffered damages and are at imminent risk of additional harm and damages.

373.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

374.    As a result of the Data Breach, Plaintiffs and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, closely reviewing and monitoring bank accounts, credit reports, and statements

sent from providers and their insurance companies and the payment for credit monitoring and identity theft prevention services.

375.    Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

376.    The damages Plaintiffs and the Class have suffered and will suffer were and are the direct and proximate result of Defendant's negligent and/or grossly negligent conduct.

## COUNT II – NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class, or in the alternative on behalf of the State Subclasses)

377.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

378.    Pursuant to HIPAA, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

379.    HIPAA requires compliance with its "applicable standards, implementation specifications, and requirements," including HIPAA's Security Rule. HIPAA's rules, publications, and orders also form part of the basis of Defendant's duty in this regard.

380.    Defendant violated HIPAA by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

381.     The FTC rules and regulations require companies to maintain adequate levels of data security, permanently delete PII that is no longer necessary to maintain, and to promptly notify victims of a data breach involving their PII and PHI.

382.     Defendant's violations of HIPAA and the FTCA constitute negligence *per se* as Defendant's violations of HIPAA and the FTCA establish the duty and breach elements of negligence.

383.     Plaintiffs and Class Members are within the class of persons that HIPAA and the FTC rules and regulations are intended to protect.

384.     The harm that occurred as a result of the Data Breach is the type of harm HIPAA and the FTC rules and regulations are intended to guard against.

385.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

386.     The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet their duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

387.     As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT III – INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Nationwide Class, or in the alternative on behalf of the State Subclasses)

388.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

389.     Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

390.     Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

391.     Defendant affirmatively and recklessly disclosed Plaintiffs' and Class Members' Private Information to unauthorized third parties.

392.     The unauthorized disclosure and/or acquisition (*i.e.*, theft) by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

393.     Defendant's reckless and negligent failure to protect Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

394.     In failing to protect Plaintiffs' and Class Members' Private Information, Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

395.     Because Defendant failed to properly safeguard Plaintiffs' and Class Members' Private Information, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

396.     Defendant knowingly did not notify Plaintiffs and Class Members in a timely fashion about the Data Breach.

397.     As a proximate result of Defendant's acts and omissions, Plaintiffs and the Class Members' private and sensitive Private Information was stolen by a third party and is now

available for disclosure and redisclosure without authorization, causing Plaintiffs and Class Members to suffer damages.

398.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members since their Private Information are still maintained by Defendant with their inadequate cybersecurity system and policies.

399.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard Plaintiffs' and Class Members' Private Information.

400.    Plaintiff, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information.

401.    Plaintiff, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## COUNT IV – BREACH OF FIDUCIARY DUTY
**(On Behalf of Plaintiffs and the Nationwide Class, or in the alternative on behalf of the State Subclasses)**

402.    Plaintiffs incorporate by reference all preceding factual allegations as though fully alleged herein.

403.    A relationship existed between Plaintiffs and Class Members, and Defendant, in which Plaintiffs and Class Members put their trust in Defendant to protect their Private Information. Defendant accepted this duty and obligation when it received Plaintiffs' and Class Members' Private Information.

404.    Plaintiffs and Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and refrain from disclosing their Private Information to unauthorized third parties.

405.    Defendant knew or should have known that the failure to exercise due care in the collecting, storing, and using of Private Information involved an unreasonable risk of harm to Plaintiffs and Class Members, including harm that foreseeably could occur through the criminal acts of a third party.

406.    Defendant's fiduciary duty required it to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' Private Information in Defendant's possession was adequately secured and protected.

407.    Defendant also had a fiduciary duty to have procedures in place to detect and prevent improper access and misuse of Plaintiffs' and Class Members' Private Information. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant, and Plaintiffs and Class Members. That special relationship arose because Defendant was entrusted with Plaintiffs' and Class Members' Private Information.

408.    Defendant breached its fiduciary duty that it owed Plaintiffs and the Class by failing to case in good faith, fairness, and honesty; by failing to act with the highest and finest loyalty; and by failing to protect the Private Information of Plaintiffs and the Class Members.

409.    Defendant's breach of fiduciary duties was a legal cause of damages to Plaintiffs and Class Members.

410.     But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred, and the Data Breach contributed substantially to producing the damage to Plaintiffs and Class Members.

411.     As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to actual, consequential, and nominal damages and injunctive relief, with amounts to be determined at trial.

## COUNT V – DECLARTORY JUDGMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

412.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

413.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

414.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information. Plaintiffs allege that Defendant's data security measures remain inadequate. Defendant publicly denies these allegations. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and remains at imminent risk that further compromises of their Private Information will occur in the future. It is unknown what specific measures and changes Defendant has undertaken in response to the Data Breach.

415.     Plaintiffs and Class Members have an ongoing, actionable dispute arising out of Defendant's inadequate security measures, including (i) Defendant's failure to encrypt Plaintiffs'

and Class Members' Private Information, including health insurance information, while storing it in an Internet-accessible environment, and (ii) Defendant's failure to delete Private Information it has no reasonable need to maintain in an Internet-accessible environment, including the health insurance information of Plaintiffs and Class Members.

416.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owes a legal duty to secure the Private Information of Plaintiffs and the Class;

b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' Private Information; and

c.    Defendant's ongoing breaches of its legal duty continue to cause Plaintiffs and Class Members harm.

417.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry and government regulatory standards to protect consumers' Private Information. Specifically, this injunction should, among other things, direct Defendant to:

a.    engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

b.    audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

c.    regularly test its systems for security vulnerabilities, consistent with industry standards;

d.    implement an education and training program for appropriate employees regarding cybersecurity.

418.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant

occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

419.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. They will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

420.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and others whose confidential information would be further compromised.

### COUNT VI – VIOLATION OF THE IOWA CONSUMER FRAUDS ACT
**Iowa Code Chapter 714H.** *et seq.*
**(By Plaintiffs on behalf of the Class, or, in the alternative, the Iowa Subclass)**

421.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

422.    The ICFA prohibits a person or entity from:

> [Engaging] in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement [and/or] sale[.]

Iowa Code § 714H.3(1).

85

423.     Iowa Code defines an unfair practice as "an act or practice which causes substantial, unavoidable injury to consumer that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714.16(1)(n).

424.     Defendant's deceptive acts or practices in the conduct of business include, but are not limited to:

a.      Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.      Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which were direct and proximate causes of the Data Breach;

c.      Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including but not limited to duties imposed by HIPAA and the FTC Act, which were direct and proximate causes of the Data Breach;

d.      Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e.      Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information;

f.      Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' Private Information;

g.      Omitting, suppressing, and concealing the material fact that it did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information; and

h.      Failing to promptly and adequately notify Plaintiffs and Class Members that their Private Information was accessed by unauthorized persons in the Data Breach.

425.     Defendant is engaged in, and its acts and omissions affect, trade and commerce. Defendant's relevant acts, practices and omissions complained of in this action were done in the

course of Defendant's business of marketing, offering for sale, and selling goods and services throughout Iowa and the United States.

426.    Defendant had exclusive knowledge of material information regarding its deficient security policies and practices, and regarding the security of Plaintiffs' and Class Members' Private Information. This exclusive knowledge includes, but is not limited to, information that Defendant received through internal and other non-public audits and reviews that concluded that Defendant's security policies were substandard and deficient, and that Plaintiffs' and Class Members' Private Information and other Defendant data was vulnerable.

427.    Defendant's representations and omissions were material because they were likely to deceive reasonable individuals about the adequacy of Defendant's data security and its ability to protect the confidentiality of Plaintiffs' and Class Members' Private Information.

428.    Had Defendant disclosed that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business without adopting reasonable data security measures and complying with the law. Instead, Defendant received, maintained, and compiled Plaintiffs' and Class Members' Private Information without advising that Defendant's data security practices were insufficient to maintain the safety and confidentiality of their Private Information.

429.    Accordingly, Plaintiffs and Class Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

430.    The injuries suffered by Plaintiffs and the Class greatly outweigh any potential countervailing benefit to consumers or to competition, and are not injuries that Plaintiffs and the Class should have reasonably avoided.

431.    Plaintiffs and the Class seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their Private Information without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## COUNT VII – VIOLATION OF THE
## IOWA PERSONAL INFORMATION SECURITY BREACH PROTECTION ACT
**Iowa Code Ch. 715C, *et seq.***
**(By Plaintiffs on behalf of the Class, or, in the alternative, the Iowa Subclass)**

432.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

433.    The PISBPA provides that:

> Any person who owns or licenses computerized data that includes a consumer's personal information that is used in the course of the person's business . . . and that was subject to a breach of security shall give notice of the breach of security following discovery of such breach of security . . . to any consumer whose personal information was included in the information that was breached. The consumer notification shall be made in the most expeditious manner possible and without unreasonable delay.

Iowa Code § 715C.2(1).

434.    Iowa Code § 715C.1(11)(a)(1-3) defines "personal information" as "an individual's first name or first initial and last name in combination with any one or more of the following[:] Social Security number, driver's license number, and financial account information."

435.    Defendant owned or licensed computerized data, which included Plaintiffs' and Class Members' Private Information, as part of its operations; specifically, it was a licensee of this information in using it to identify customers and employees, provide services, and by storing this valuable and highly sensitive information on its computer systems and network.

436.     Defendant became aware, or should have been aware based on ample evidence, of the intrusion and Data Breach on or about February 22, 2023, yet it delayed until August 25, 2023, before sending out notices to affected individuals.

437.     Under Iowa Code § 715C.2(2), Defendant was required to send notice of the breach to victims "immediately following discovery of such breach of security if a consumer's personal information was included . . . ." Defendant failed to send the requisite "immediate" notice under Iowa law and ran afoul of PISBPA.

438.     Furthermore, because Defendant was aware of the breach of security of its systems, Defendant had an obligation to disclose the Data Breach in a timely fashion without unreasonable delay.

439.     This delay on the part of Defendant caused additional harm to Plaintiffs and Class Members because they were not able to immediately take precautionary action to prevent and mitigate the effects of identity theft and financial fraud.

440.     By failing to disclose the Data Breach in a timely and reasonable manner, Defendant violated Iowa Code §§ 715C.2(1).

441.     Pursuant to Iowa Code § 715C.2(9), a violation of this section is considered an unlawful practice under Iowa Code §§ 714.16(7).

442.     Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by PISBPA, including actual or nominal damages; declaratory and injunctive relief; reasonable attorneys' fees and costs; and any other relief that is just and proper.

**COUNT VIII**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**FLA. STAT. § 501.201,** *et seq.*
**(On Behalf of Plaintiff Stella Keritsis and the Florida Subclass)**

443.    Plaintiff Stella Keritsis re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs.

444.    Plaintiff Stella Keritsis ("Plaintiff" for the purposes of this Count) brings this Count on her own behalf and on behalf of the Florida Subclass (the "Class" for purposes of this Count).

445.    FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204.

446.    Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce.

447.    While engaged in trade or commerce, Defendant violated FDUTPA, including, among other things, by:

a.    Failing to implement and maintain appropriate and reasonable security procedures and practices to safeguard and protect the PII of Plaintiff and the Class from unauthorized access and disclosure; and

b.    Failing to disclose that its third-party's computer systems and data security practices were inadequate to safeguard and protect the PII of Plaintiff and the Class from being compromised, stolen, lost, or misused.

448.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information entrusted to it, and that risk of a data breach or theft was highly likely.

449.    Defendant should have disclosed this information because it was in a superior position to know the true facts related to the defective data security.

450.     Defendant's failures constitute false and misleading representations, which have the capacity, tendency, and effect of deceiving or misleading consumers (including Plaintiff and Class Members) regarding the security of Plaintiff's and Class Members' Private Information.

451.     The representations upon which impacted individuals (including Plaintiff and Class Members) relied were material representations (*e.g.*, as to Defendant' adequate protection of Private Information), and consumers (including Plaintiff and Class Members) relied on those representations to their detriment.

452.     Defendant's actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to Plaintiff and the Class.

453.     In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices acts by omitting, failing to disclose, or inadequately disclosing to Plaintiff and Class Members that it did not follow industry best practices for the collection, use, and storage of Private Information

454.     As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts and omissions, Plaintiff's and Class Members' Private Information was disclosed to third parties without authorization, causing and will continue to cause Plaintiff and Class Members damages. Accordingly, Plaintiff and Class Members are entitled to an order providing declaratory and injunctive relief and reasonable attorneys' fees and costs, to the extent permitted by law.

455.     Also, as a direct result of Defendant's knowing violation of the Florida Deceptive and Unfair Trade Practices Act, Plaintiff and Class Members are entitled to injunctive relief, including, but not limited to:

a.   Ordering Defendant to ensure that all third-party vendors it engages employ adequate data security, training, user controls, and protocols prior to releasing Plaintiffs' and Class Members' Private Information.

b.   Requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to Private Information and to promptly migrate to superior or more secure alternatives.

## COUNT IX
## VIOLATION OF THE KENTUCKY DATA BREACH NOTIFICATION LAW
### Ky. Rev. Stat. § 365.730, *et seq.*
### (On Behalf of Plaintiff Logan Aldridge and the Kentucky Subclass)

456.   Plaintiff Logan Aldridge re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs.

457.   Plaintiff Logan Aldridge ("Plaintiff" for the purposes of this Count) brings this Count on his own behalf and on behalf of the Kentucky Subclass (the "Class" for purposes of this Count").

458.   The Kentucky data breach notification law requires business that maintain computerized personally identifiable information to disclose a security breach to Kentucky residents whose personally identifiable information was or is believed to have been acquired by an unauthorized individual. Notice must be provided to Kentucky residents "in the most expedient time possible and without unreasonable delay." Ky. Rev. Stat. § 365.732(2).

459.   Defendant is a "business" as defined by Ky. Rev. Stat. § 365.720(1), and an "information holder" as defined by Ky. Rev. Stat. § 365.732(1)(b).

460.   Plaintiff and Class Members are "customers" as defined by Ky. Rev. Stat. § 365.720(2).

461.   Plaintiff's and Class Members' Private Information constitutes "personally identifiable information" as defined by Ky. Rev. Stat. § 365.732(1)(c).

462. By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Ky. Rev. Stat. § 365.732(2).

463. As a direct and proximate result of Defendant's violations of Ky. Rev. Stat. § 365.732(2), Plaintiff and Class Members suffered damages, as described above.

464. Plaintiff and Class Members seek relief under Ky. Rev. Stat. § 446.070.

**COUNT X**
**VIOLATION OF THE TENNESSEE IDENTITY THEFT DETERNCE ACT**
**TENN. CODE § 47-18-2101, *et seq.***
**(On Behalf of Plaintiff Ronald Emmert and the Tennessee Subclass)**

465. Plaintiff Ronald Emmert re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs.

466. Plaintiff Ronald Emmert ("Plaintiff" for the purposes of this Count) brings this Count on her own behalf and on behalf of the Tennessee Subclass (the "Class" for purposes of this Count").

467. Defendant is a business that owns or licenses computerized data that includes Personal Information as defined by Tenn. Code § 47-18-2107(a)(2).

468. Plaintiff and Class Members' Personal Information that was compromised in the Data Breach includes Personal Information as covered under Tenn. Code § 47-18-2107(a)(3)(A).

469. Defendant is required to accurately notify Plaintiff and Class Members if it becomes aware of a breach of its data security systems that is reasonably likely to have caused unauthorized persons to acquire Plaintiff's and Class Members' Private Information in the most expedient time possible and without unreasonable delay under Tenn. Code § 47-18-2107(b).

470. Because Defendant discovered a breach of its security systems in which unencrypted Private Information was, or is reasonably believed to have been, acquired by an

unauthorized person, Defendant has an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Tenn. Code § 47-18-2107(b).

471.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Tenn. Code § 47-18-2107(b).

472.    As a direct and proximate result of Defendant's violations of Tenn. Code § 47-18-2107(b), Plaintiff and Class Members suffered damages, as described above.

473.    Plaintiff and Class Members seek relief under Tenn. Code §§ 47-18-2107(h), 47-18-2104(d), and 47-18-2104(f), including actual damages and injunctive relief.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

A.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class and Subclasses as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B.    A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

C.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

iii.    Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

iv.    Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's

systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v.      Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for their provisions of services;

vi.     Ordering that Defendant conduct regular database scanning and securing checks; and

vii.    Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

D.     An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

E.     A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

F.     An award of such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 28, 2023

Respectfully submitted,

*/s/ J. Barton Goplerud*
J. Barton Goplerud
Brian O. Marty
**SHINDLER, ANDERSON, GOPLERUD & WEESE P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel: (515) 223-4567
Fax: (515) 223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

Nickolas J. Hagman (admitted pro hac vice)
Daniel O. Herrera*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle St., Suite 3210
Chicago, IL 60603

Phone: 312-782-4880
nhagman@caffertyclobes.com
dherrera@caffertyclobes.com

*Counsel for Plaintiffs Michael Douglas and
Dorothy Goodon*

Kevin Laukaitis (PA ID 321670)*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
(215) 789-4462
klaukaitis@laukaitislaw.com

*Counsel for Plaintiff Clyde Burry*

Gary M. Klinger (admitted pro hac vice)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Counsel for Plaintiff Dorothy Alexander*

William B. Federman *
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
wbf@federmanlaw.com

*Counsel for Plaintiff Stella Keritsis*

**SIRI & GLIMSTAD LLP**
Mason A. Barney*
Tyler J. Bean*
745 Fifth Avenue, Suite 500
New York, New York 10151
212-532-1091
mbarney@sirillp.com
tbean@sirillp.com

*Counsel for Plaintiff Johnnie Jones*

David S. Almeida
Elena A. Belov
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024
david@almeidalawgroup.com
elena@almeidalawgroup.com

Timothy M. Hansen, AT0010747
**HANSEN REYNOLDS LLC**
301 N. Broadway, #400
Milwaukee, WI 53202
Tel: (414) 273-8473
thansen@hansenreynolds.com

Nicholas J. Mauro
**CARNEY & APPLEBY LAW FIRM**
303 Locust St., #400
Des Moines, IA 50309
Tel: (515) 282-6803
mauro@carneyappleby.com

*Counsel for Plaintiffs Yolanda Betts and
Logan Aldridge*

William "Billy" Peerce Howard, Esq.
(Florida Bar No. 0103330)
Amanda J. Allen, Esq. (Florida Bar No.
0098228)
**THE CONSUMER PROTECTION
FIRM**
401 East Jackson Street, Suite 2340
TRUIST PLACE
Tampa, FL 33602
Telephone: (813) 500-1500
Facsimile: (813) 435-2369
Billy@TheConsumerProtectionFirm.com

*Counsel for Plaintiff Steven D'Angelo*

Laura Van Note, Esq. (C.A. S.B. #310160)
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Telephone: (510) 891-9800
Facsimile: (510) 891-7030

Email: lvn@colevannote.com

*Counsel for Plaintiff Ronald Emmert*

Stephen R. Basser*
Samuel M. Ward*
**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:   (619) 230-1874
sbasser@barrack.com
sward@barrack.com

John G. Emerson*
**EMERSON FIRM, PLLC**
2500 Wilcrest, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659
jemerson@emersonfirm.com

*Counsel for Plaintiffs Christine Ashe, Vernita Ford, and Diane Young*

*\*pro hac vice application forthcoming*

*Counsel for Plaintiffs and the Putative Class in the Consolidated Action*